# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCRIPPS MERCY HOSPITAL SAN DIEGO<br>4077 Fifth Avenue<br>San Diego, CA 92103<br><br>UT HEALTH TYLER<br>1000 South Beckham<br>Tyler, TX 75701<br><br>UT HEALTH ATHENS<br>2000 South Palestine<br>Athens, TX 75751<br><br>RICHMOND UNIVERSITY MEDICAL CENTER<br>355 Bard Avenue<br>Staten Island NY 10310<br><br>NIAGARA FALLS MEMORIAL MEDICAL CENTER<br>621 Tenth Street<br>Niagara Falls, NY 14302<br><br>CROUSE HOSPITAL<br>736 Irving Avenue<br>Syracuse, NY 13210<br><br>PACIFIC ALLIANCE MEDICAL CENTER<br>531 West College Street<br>Los Angeles, CA 90012<br><br>BILLINGS CLINIC HOSPITAL<br>2800 Tenth Avenue North<br>Billings, MT 59101<br><br>TOURO LCMC HEALTH<br>1401 Foucher Street<br>New Orleans, LA 70115<br><br>MILFORD REGIONAL MEDICAL CENTER<br>14 Prospect Street | Case No. <u>1:24-cv-3052</u> |

1

Milford, MA 01757

                    Plaintiffs,


        v.


XAVIER BECERRA, Secretary,
United States Department of Health and
Human Services
200 Independence Avenue S.W.
Washington, D.C. 20201


                    Defendant.

---

## COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY RELIEF UNDER THE MEDICARE ACT AND ADMINISTRATIVE PROCEDURES ACT

### The Secretary's Retroactive Part C Days Final Rule
### Is Contrary to Law

1.      This case presents the question whether a Medicare reimbursement "Final Rule" enacted by the Secretary of Health and Human Services is invalid.  One of the major questions is whether the Secretary can intentionally disregard binding and long-standing court rulings prohibiting a change in policy in calculating Medicare reimbursements to hospitals until after formal rulemaking, and instead, years later establish a "final rule" purporting to change the same policy "retroactively" dating back to cover the entire twenty-five year period expressly addressed by the binding case rulings prohibiting the change.

2.      Such a Final Rule would change the economics for thousands of hospitals around the country, by sums estimated to be multiple billions of dollars.  Such hospitals—and the Plaintiffs here–serve a disproportionate share of indigent patients and receive compensation from the Medicare system operated by the Defendant, Secretary of Health and Human Services.  Defendant

2

has been trying for decades to change its policies to more restrictively calculate hospitals' Medicare reimbursements than it did prior to 2004, and been repeatedly rebuffed by court rulings of the United States Supreme Court[1] and Circuit Courts[2] which expressly prohibit change of the Secretary's calculation policy until AFTER formal rulemaking. More than a decade after the Northeast decision, the Secretary completed the formal rulemaking for the express purpose of making a Final Rule that would be RETROACTIVE for the entire period covered by the cases that had already ruled against the exact same change.

3.      This case also asserts that the purported "retroactive" final rule is contrary to the applicable statute governing the calculation of the Plaintiff hospitals' Medicare reimbursements, challenging the Secretary's irrational and unlawful interpretation of the statutes he is entrusted to administer—which has deprived the Hospitals of the reimbursements they are due—along with his refusal to enable the Hospitals to effectively employ the congressionally mandated procedures for obtaining relief from these underpayments. With *Chevron* deference overruled (*see Loper Bright Enters. v. Raimondo*, No. 22-451, slip op. (U.S. June 28, 2024); *Relentless, Inc. v. Dep't of Commerce*, No. 22-1219, slip op. (U.S. June 28, 2024)), courts may no longer routinely uphold the decisions of agencies in technical fields simply because of the complexity of the statutory schemes they oversee. Rather, "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Id*. at 22. And it is the job of the Court to discern the "best" reading. *Id*. at 23 ("In the business of statutory interpretation, if it is not the best, it is not permissible."). In this new paradigm, more than ever, the Secretary's actions at issue here must fall, and the Hospitals are entitled to the relief they seek.

---

[1] Allina Health Services v. Sebelius, 746 F.3d 1102, 1106 (D.C. Cir. 2014) ("Allina I"), and Azar v. Allina Health Servs., 139 S. Ct. 1804 (June 3, 2019), 863 F.3d at 943. 85 Fed. Reg. 47,723, 47,724-25 (Aug. 6, 2020) (Állina II).

[2] Northeast Hosp. Corp. v. Sebelius, 657 F.3d 1 (D.C. Cir. 2011) ("Northeast").

4.      The Plaintiff hospitals listed above (herein at times, "Providers") bring this action under 42 U.S.C. § 1395oo(f)(1) for judicial review and reversal of a final decision of the Defendant, Xavier Becerra, acting in his official capacity as the Secretary of the United States Department of Health and Human Services ("HHS"), and acting through HHS's Provider Reimbursement Review Board ("PRRB" or "Board"), and for judicial review and invalidation of the final rule in the Federal Register regarding CMS's Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage. 88 Fed. Reg. 37772 (June 9, 2023) ("Retroactive Part C Days Final Rule" or "Retroactive Rule"), under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act"), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

**The Procedural Question At Issue – Whether The Secretary's Provider
Reimbursement Review Board Improperly Dismissed Plaintiffs' Appeals, and
Further Exhaustion of Administrative Remedies is Excused**

5.      In appeals before CMS's Provider Reimbursement Review Board ("PRRB" or "the Board"), the Plaintiffs challenged CMS's publication of a final rule in the Federal Register regarding CMS's Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage. 88 Fed. Reg. 37772 (June 9, 2023). **Exhibit 1**.

6.      In a decision dated February 29, 2024, the Board dismissed the Plaintiffs' challenges to a regulation promulgated by the Centers for Medicare and Medicaid Services ("CMS"), the agency within HHS charged with administering the Medicare program. **Exhibit 2**.

7.      Reconsideration was submitted April 24, 2024 (**Exhibit 3**) and denied by the Board August 29, 2024.  (**Exhibit 4**).

8.      The Board asserted the following jurisdictional grounds upon which it based its dismissal: (1) the Retroactive Part C Days Final Rule was not an appealable "final determination"

within the context of 42 U.S.C. § 1395oo(a)(1)(A)(ii) and 42 C.F.R. §§ 405.1835(a); (2) even if it were, the Providers failed to establish that the Retroactive Part C Days Final Rule applied to them; and (3) the Providers did not properly appeal CMS's publication of SSI Ratios related to the Retroactive Part C Days Final Rule. **Exhibit 2 and Exhibit 4.**

9.      The Board's dismissal was improper, because Plaintiffs satisfied the requirements to appeal under 42 U.S.C. § 1395oo(a)(1)(A) by appealing the Secretary's final determination as to the calculation of the payment amount under subsection (d) of 42 U.S.C. § 1395ww that is applicable to the cost years at issue.

10.      On the procedural issues, the Plaintiffs seek an order vacating and setting aside the Board's decision and its underlying findings and conclusions as arbitrary and capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence. See 5 U.S.C. § 706.

## JURISDICTION AND VENUE

11.      This action arises under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 et seq. (the "Medicare Act"), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

12.      This court has jurisdiction under 42 U.S.C. § 1395oo(f)(1), which grants Medicare providers the right to obtain judicial review of any final Medicare program agency decision.

13.      Venue is proper in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1).

## PARTIES

14.      The Plaintiffs here are the Medicare-participating hospitals identified in **Exhibit 1,** which have appealed their disproportionate share hospital ("DSH") payments for the fiscal years identified. The Plaintiffs in this action and hospital fiscal years at issue are as follows:

(1)     Scripps Mercy Hospital San Diego, Provider No. 05-0077, Fiscal Years ending as of September 30, 2004, September 30, 2005, September 30, 2006, September 30, 2007, September 30, 2009, September 30, 2010, September 30, 2011, and September 30, 2012;

(2)     UT Health Tyler, Provider No. 45-0083, Fiscal Years ending as of October 31, 2008, and October 31, 2012;

(3)     UT Health Athens, Provider No. 45-0389, Fiscal Years ending as of April 30, 2010, April 30, 2012, and April 30, 2013.

(4)     Richmond University Medical Center, Provider No. 33-0028, Fiscal Years ending as of December 31, 2006, December 31, 2008, and December 31, 2009.

(5)     Niagara Falls Memorial Medical Center, Provider No. 33-0065, Fiscal Year ending as of December 31, 2007.

(6)     Crouse Hospital, Provider No. 33-0203, Fiscal Year ending as of December 31, 2007.

(7)     Pacific Alliance Medical Center, Provider No. 05-0018, Fiscal Year ending as of December 31, 2008.

(8)     Billings Clinic Hospital, Provider No. 27-0004, Fiscal Year ending as of June 30, 2008.

(9)     Touro LCMC Health, Provider No. 19-0046, Fiscal Years ending as of December 31, 2011, and December 31, 2012; and

(10)     Milford Regional Medical Center, Provider No. 22-0090, Fiscal Year ending as of September 30, 2012.

15.     Defendant Xavier Becerra is the Secretary of the Department of Health and Human Services and is the federal officer responsible for administering the Medicare program pursuant to the Social Security Act. Defendant is sued in his official capacity. References to "Defendant" or "Secretary" herein are meant to refer to him, his subordinates, his official predecessors or successors, and the Department and its components that he oversees, as the context requires.

## LEGAL BACKGROUND

### Medicare Payment Determinations and Appeals

16.     The Medicare program, established under Title XVIII of the Social Security Act, is a public health insurance program that furnishes health benefits to the aged, disabled and certain individuals with end-stage renal disease. 42 U.S.C. § 1395, *et seq*.

17.     The Medicare program consists of four parts: A, B, C, and D. Inpatient hospital services are paid under Part A of the Medicare statute. *Id.* § 1395d(a). Physician and certain outpatient clinic services are paid under Medicare Part B. *Id.* § 1395k(a). Medicare Part C is an optional managed care program that pays for services that would otherwise be covered under Medicare Parts A and B. *Id.* §§ 1395w-21–1395w-29.   Medicare Part C is also known at various times as Medicare Advantage, or M+A, or Medicare HMO (collectively herein, "Medicare Part C").  Medicare Part D is an optional insurance program for prescription drugs. *Id.* §§ 1395w-101–1395w-154. This action concerns payments under Medicare Part A or Medicare Part C.

18.     Since 1983, the Medicare program has paid acute-care hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). *Id.* § 1395ww(d); 42 C.F.R. pt. 412. Under inpatient PPS, Medicare pays hospitals a predetermined, standardized amount per case, subject to certain payment adjustments. *Id.*

19.     One such payment adjustment is the DSH payment, which is provided to hospitals, including the Plaintiffs, that treat a disproportionate share of low-income patients. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

20.     Hospitals dissatisfied with a "final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww," can file an appeal with the Board under § 1395oo(a) (emphasis added). This includes the DSH payment calculation located in § 1395ww(d)(5).

21.     To file an administrative appeal, a hospital must request a Board hearing within 180 days after notice of the Secretary's final determination, and the amount in controversy must be at least $10,000 for an appeal filed by an individual hospital, or $50,000 for an appeal filed by a group of hospitals presenting a common question of fact or legal challenge. *Id.* § 1395oo(a), (b); 42 C.F.R. § 405.1835(a).

22.     Under 42 C.F.R. § 405.1835(b), the content of the hearing request must include: a "demonstration that the provider satisfies the requirements for a Board hearing as specified in paragraph (a) of this section, including a specific identification of the final . . . Secretary determination under appeal," id. at (b)(1); "a separate explanation of why, and a description of how, the provider is dissatisfied with the specific aspects of the final . . . Secretary determination" in the manner described, id. at (b)(2); and, at issue here, "a copy of the final ... Secretary determination under appeal *and any other documentary evidence the provider considers necessary to satisfy the hearing request requirements* of paragraphs (b)(1) and (b)(2) of this section," id. at (b)(3) (emphasis added).

23.     Additionally, Board Rule 7.1 requires that a hearing request must "identify the cost reporting periods affected by the determination" and provide "a copy of the final determination."

Rule 7.1.1. Board Rules can be found at https://www.cms.gov/files/document/current-prrb-rules-v-32-board-order-no-4-december-15-2023.pdf. For an appeal from a Federal Register Notice, the request must "[i]dentify the Federal Register citation and provide the applicable pages of the Federal Register." Rule 7.1.2.3. For any "other" final determination not listed in the Rules, the provider must "identify the specific final determination being appealed and the authority granting the Board's jurisdiction over the dispute." Rule 7.1.2.5.

24.     A final decision by the Board, including a jurisdictional dismissal, is subject to judicial review. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 1877(a).

## DSH Payments and Treatment of Medicare Part C Days

25.     The formula at the core of hospitals' DSH payments is the disproportionate patient percentage ("DPP"), which is a proxy intended to measure a hospital's low-income patient population. The DPP is the sum of two fractions: the Medicare Fraction and the Medicaid Fraction. 42 U.S.C. § 1395ww(d)(5)(F)(vi).

26.     The Medicare Fraction numerator is "the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income [("SSI")] benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator

. . . is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A." *Id.* § 1395ww(d)(5)(F)(vi)(I).

27.     The Medicaid Fraction numerator is "the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, but who were not entitled to benefits under

part A of this subchapter, and the denominator . . . is the total number of the hospital's patient days for such period." *Id.* § 1395(d)(5)(F)(vi)(II).

28.    Medicare Part C refers to the Medicare Advantage program, which permits beneficiaries to enroll in managed care plans offered by private companies approved by the Secretary ("Medicare HMO"). *Id.* § 1395w-21. Under the Medicare statute, a Medicare beneficiary eligible for Medicare Advantage is entitled to elect to receive benefits (other than qualified prescription drug benefits) either through the original Medicare fee-for-service program under Parts A and B, or though enrollment in a Medicare Advantage plan under Part C. *Id.* § 1395w-21(a)(1); 42 C.F.R. § 422.50. (Such Medicare Advantage, Medicare HMO, or M+A days hereunder are referenced, collectively as "Part C Days".)

29.    Patients enrolled in a Medicare Part C plan receive their benefits under Part C of the Medicare statute, not under Part A. 42 U.S.C. § 1395w-21(a)(1); 42 C.F.R. § 422.50.

30.    CMS calculates every hospital's Medicare Fraction, also known as an SSI Ratio, by matching patient data held by CMS concerning Medicare beneficiaries and data held by the Social Security Administration concerning SSI beneficiaries. FY 2011 Final Rule, 75 Fed. Reg. 50,041, 50,277-81 (Aug. 16, 2010). Hospitals are unable to calculate their own SSI Ratio because they lack access to the necessary data. *Id.*

31.    The substantive question at issue in the Providers' dismissed appeals is whether patients enrolled in Part C plans are --"for such days" as they were in the hospital-- "entitled" to benefits under Part A, when the patients had already elected to enroll in Part C instead of Part A. If so, then days associated with those patients would belong in the Medicare Fraction, and not the Medicaid Fraction, during the period from 2004 to 2013[3].  If not, then Medicaid-eligible days

---

[3] In 2014, a new formal rule promulgated by the Secretary took effect that changed the Medicare program dramatically for hospitals' DSH reimbursements, including changing the previous policy of the Secretary NOT to

associated with those patients would belong in the Medicaid Fraction, and not the Medicare Fraction, during the period from 2004 to 2013.

32.     Before October 1, 2004, CMS did not include such days in the Medicare Fraction. At that time, CMS construed the term "entitled" in the DSH statute to mean that a patient was "entitled to benefits under Part A" when Medicare Part A covered and would pay for the patient's hospitalization. See 42 C.F.R. § 412.106(b)(2)(1)(2003). Thus, before October 1, 2004, Part C days (also called "Medicare Advantage" days, Medicare HMO or "M+A" days, collectively herein "Part C Days") were therefore excluded from the Medicare Fraction, and, if the patient was eligible for Medicaid, the days were counted in the Medicaid Fraction numerator.

### Court Cases Established the CMS Policy Could Not be Changed

33.     In 2004, CMS published a purported "final rule" adopting a new policy of counting Part C Days in the Medicare Fraction. FY 2005 IPPS Final Rule, 69 Fed. Reg. 48916, 49099 (Aug. 11, 2004). CMS's attempt in the final rule to apply the new policy retroactively was struck down in 2011 in *Northeast Hospital Corp. v. Sebelius*, 657 F. 3d 1, 13 (D.C. Cir. 2011).

34.     CMS's attempt to apply the final rule prospectively from 2005 forward was also struck down in 2014, because CMS committed a fatal error in the rulemaking process such that the final rule was not a logical outgrowth of the proposed rule. *Azar v. Allina Health Services*, 746 F.3d 1102, 1108 (D.C. Cir. 2014) ("Allina I"); 42 U.S.C. § 1395hh(a)(4).

35.     Despite the 2005 "final rule" policy having been stricken, CMS thereafter published a list of hospitals' SSI Ratios for FFY 2012 that included Part C Days in the Medicare Fraction. The U.S. Supreme Court held that to be improper as well:  **CMS's publication of the SSI Ratios**

---

include Part C Days in the Medicare Fraction, prospectively.  The rule from 2014 forward was not the subject of the Providers' dismissed appeal, and hence is not in issue here.  The Retroactive Part C Days Final Rule in 2023, which is the subject of this action, was expressly retroactive ONLY.

11

constituted a "statement of policy" that "change[d] a substantive legal standard governing . . . payment for services," and, under § 1395hh(a)(2), the policy could not take effect until AFTER the Secretary underwent notice-and-comment rulemaking procedures. *Azar v. Allina Health Servs.*, 587 U.S. 566, 572-80 (2019) ("Allina II").

36.     On remand from the Supreme Court in Allina II, CMS was tasked with providing a remedy for hospitals whose DSH payments were calculated under the invalidated policy.

37.     On August 6, 2020, CMS published its proposed "remedy," asserting that it would once again apply a retroactive policy of including Part C Days in the Medicare Fraction—contrary to law and at least three cases that had already expressly held this to be improper and unlawful. Part C Days Proposed Rule, 85 Fed. Reg. 47723 (Aug. 6, 2020).  The period of retroactivity for this 2020 Proposed Rule included "fiscal years 2013 and prior," a period with relevant hospital claims dating back twenty-five or thirty years, into the 1990's.

38.     Within two weeks, CMS issued CMS Ruling 1739-R (Aug. 17, 2020), to end any hospital appeals then pending on the issue of Part C Days.  CMS Ruling 1739-R, by its own terms, provided "notice that the Provider Reimbursement Review Board (PRRB) and other Medicare administrative appeals tribunals lack jurisdiction over certain provider appeals regarding the treatment of patient days associated with patients enrolled in Medicare Advantage plans in the Medicare and Medicaid fractions of the disproportionate patient percentage." The Ruling "applie[d] only to appeals regarding patient days with discharge dates before October 1, 2013 that arise from Notices of Program Reimbursement (NPRs) that are issued before CMS issues a new final rule to govern the treatment of patient days with discharge dates before October 1, 2013 . . .." *Id.*     CMS-1739-R is available at https://www.cms.gov/regulations-and-guidanceguidancerulingscms-rulings/cms-1739-r.

39.     On June 9, 2023, CMS finalized its proposal "that a patient enrolled in [a Part C] plan remains entitled to benefits under Medicare Part A and will be counted in the Medicare Fraction of the DPP and not counted in the numerator of the Medicaid fraction," for discharges occurring before October 1, 2013. Part C Days Final Rule, 88 Fed. Reg. 37,772, 37,790 (June 9, 2023).

40.     Between August and November 2023, CMS republished on its website the same SSI fractions that were previously released for fiscal years prior to FFY 2014, asserting that the SSI Ratios were published "pursuant to CMS-1739-F," i.e., the Part C Days Final Rule. CMS relabeled under CMS-1739-F the exact SSI Ratio files that it had created a decade or longer ago. CMS did not re-calculate the ratios as part of the post-*Allina II* rulemaking in 2020-2023, and CMS never formally announced the reissuance of the existing SSI Ratios. CMS, *Disproportionate Share Hospital (DSH)*, https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps/disproportionate-share-hospital-dsh.

## PROCEDURAL BACKGROUND

### The Providers' Part C Days Appeals

41.     From 2008 through 2019, the Plaintiffs filed timely appeals at the Board under § 1395oo(a)(1)(A)(i) from NPRs issued by their respective Medicare Administrative Contractors ("MACs") challenging CMS's policy of counting Part C Days in the Medicare Fraction of their DPPs for fiscal years ranging from 2005 through 2013. The case numbers of these appeals were identified for every Provider and fiscal year in attachments to the designated representative letters filed with the Providers' appeals of the 2023 Part C Days Final Rule.

42.     As a matter of Board record and/or public court record, these Board cases were either: (a) granted expedited judicial review by the Board, appealed to the United States District

Court for the District of Columbia, consolidated with *In Re: Allina II-Type DSH Adjustment Case*, No. 19-mc-00190, and then remanded to the Secretary by court order granting the Secretary's motion for voluntary remand in accordance with CMS Ruling 1739-R (see Orders and attachment, Dkt. 74, 74-1, 99, Case No. 19-mc-190 (D.D.C. Jan. 19, 2021, March 12, 2021)) or (b) remanded to the Secretary by the Board in accordance with CMS Ruling 1739-R, then similarly appealed to the United States District Court for the District of Columbia and consolidated with *In Re: Allina II-Type DSH Adjustment Case*, No. 19-mc-00190.

43.    After the Retroactive Part C Days Final Rule was published advising hospitals that CMS's proposed remedy in response to its loss in *Allina II* was to apply exactly the same policy that was previously invalidated, the Providers timely appealed the Secretary's final determination—contained in the Retroactive Part C Days Final Rule and the accompanying SSI ratios—as to the DSH payment amount they will receive for the fiscal years at issue. **Exhibit 3** (a copy of the issue statement filed by all of the Providers in their Board appeals challenging the Retroactive Part C Days Final Rule, incorporated herein as though set forth in full).

44.    The Providers' appeals identified the final determination under appeal by citing the Part C Days Final Rule in the federal register and its publication date of June 9, 2023, and provided a copy of the final determination including the full 22-page text of the pertinent section of the Retroactive Part C Days Final Rule, as well as an active hyperlink to the SSI Ratio files. The appeals also contained an issue statement describing the nature of the Providers' dissatisfaction with the final determination (**Exhibit 3**); a calculation of the Providers' amounts in controversy for each impacted fiscal year; a designation of representative letter that identified the claims covered by the representation through a list of the Providers' previously appealed fiscal years and the Board case number associated with those appeals; a statement that no adjustment or protested

14

amount is required for Board jurisdiction; and a statement that due to its retroactive nature, this particular final determination impacted more than one fiscal year.

45.     On February 29, 2024, the Board *sua sponte* dismissed the Providers' appeals, basing its decision on factual inaccuracies about the contents of the Providers' appeal requests and legal inaccuracies about the requirements of an appeal request.  The Providers submitted a request for Reconsideration on April 24, 2024, which the Board denied August 29, 2024.

46.     Providers now timely seek judicial review under 42 U.S.C. § 1395oo(f)(1).

## Judicial Review of Certain Medicare Claims Where Remand Is Futile

47.     As made applicable to the Medicare statute (*see* 42 U.S.C. § 1395ii), 42 U.S.C. § 405(h) divests the district courts of federal-question jurisdiction to hear "any claim arising under" the Medicare statute, and bars any "decision of the [Secretary of HHS]" from being judicially reviewed, "except as herein provided."1

48.     The exception "herein provided" is created by 42 U.S.C. § 405(g). This provision, although not expressly incorporated into the Medicare statute under § 1395ii, has been treated by the Supreme Court as such. *See Shalala v. Ill. Council on Long Term Care, Inc*., 529 U.S. 1, 7-9 (2000); *Heckler v. Ringer*, 466 U.S. 602, 614-615 (1984); *see also Am. Hosp. Ass'n v. Azar*, 895 F.3d 822 (D.C. Cir. 2018). Section 405(g), as made applicable to the Medicare statute, authorizes any person to file a civil action, "after any final decision of the [Secretary of HHS] made after a hearing to which he was a party," to "obtain a review of such decision" in federal district court.

49.     Courts have interpreted Section 405(g) to impose two requirements for obtaining judicial review of Medicare claims. The first, which is jurisdictional and hence not waivable, requires that the plaintiff have "presented" the claim to the Secretary of HHS. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976); *Am. Hosp*., 895 F.3d at 825. The second, which is waivable, is that the

plaintiff must have exhausted the "administrative remedies prescribed by the Secretary." *Mathews*, 424 U.S. at 328; *Am. Hosp.*, 895 F.3d at 826.

50.    The D.C. Circuit has held that the futility of exhausting the administrative review process may be an independently sufficient ground for waiver of the exhaustion requirement. *See Tataranowicz v. Sullivan*, 959 F.2d 268, 275 (D.C. Cir. 1992). [4] Exhaustion of the administrative review process may be futile where, for example, there are no facts in dispute and the only issue is a purely legal question. *See id.* at 274. Waiver of exhaustion is proper where judicial resolution of the claim at issue "(1) will not interfere with the agency's efficient functioning; (2) will not thwart any effort at self-correction; (3) will not deny the court or parties the benefit of the agency's experience or expertise; and (4) will not curtail development of a record useful for judicial review." *Id.* at 275.

51.    Where, as here, the Board has already decided that it lacks authority to decide the questions raised as to the invalidity of the Retroactive Part C Days Final Rule,[5] the Medicare Act's "channeling requirement[] [is] not a foreclosure provision." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000);. "If the claimant can obtain judicial review only in a federal question suit, [the Medicare Act] will not bar the suit." *Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 859 (D.C. Cir. 2007) (citation omitted). Otherwise, as the Supreme Court has explained, the channeling provision "would not lead to a channeling of review through the agency, but would mean no review at all." *Ill. Council*, 529 U.S. at 17.

---

[4] 1 The Supreme Court has held, however, that "§ 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 19 (2000); see also Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986).
[5] See Complaint in Montefiore Medical Center v. Becerra, Case No. 1:24-cv-01810-LLA, D.C. District Court, June 24, 2024, and in Montefiore Medical Center v. Becerra, Case No. 1:24-cv-02991, D.C. District Court, October 21, 2024, in which Expedited Judicial Review was granted by the Board expressly because the Board lacked authority to decide the questions raised as to the invalidity of this same Final Rule.

## Judicial Review Under the Mandamus Act

52.     The Mandamus Act grants district courts jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

53.     In the D.C. Circuit, jurisdiction under the Mandamus Act is available even in circumstances where federal-question jurisdiction or other statutory jurisdiction would be precluded by 42 U.S.C. § 405(h). *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001) ("joining the virtual unanimity of circuit courts" holding "that § 1361 jurisdiction is not barred" by Section 405(h)). Courts have emphasized that mandamus jurisdiction is particularly appropriate where the plaintiff brings a procedural challenge unrelated to substantive questions of entitlement to Medicare benefits. See *Burnett v. Bowen*, 830 F.2d 731, 738 (7th Cir. 1987*); Lopez v. Heckler*, 725 F.2d 1489, 1507 (9th Cir. 1984), vacated and remanded on other grounds, 469 U.S. 1082 (1984); *Belles v. Schweiker*, 720 F.2d 509, 512-513 (8th Cir. 1983).

54.     Jurisdiction under the Mandamus Act is available if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig*., 414 F.3d 7, 10 (D.C. Cir. 2005) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)). If all jurisdictional requirements are met, a court may grant relief under 28 U.S.C. § 1361 "when it finds compelling equitable grounds." Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016) (quoting Medicare Reimbursement, 414 F.3d at 10).

## ASSIGNMENT OF ERRORS

55.     The Medicare Act allows for judicial review of the Board's jurisdictional dismissal and the substantive questions presented here "pursuant to the applicable provisions under chapter 7 of title 5," of the APA. 42 U.S.C. § 1395oo(f)(1).

56.     The APA provides that the "reviewing court shall... hold unlawful and set aside agency action... found to be... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;... (C) in excess of statutory jurisdiction, authority or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence[.]" 5 U.S.C. § 706(2).

57.     Under this standard, the dismissal of the Plaintiffs' appeal was invalid, the exhaustion of administrative remedies is properly excused, and the Retroactive Part C Days Final Rule is invalid, and should be set aside, including for (but not limited to) the reasons more specifically described below.

## CLAIMS FOR RELIEF
### Count I: Board Dismissal for Lack of Jurisdiction
### (Final Rule not a Final Determination)

58.     The Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

59.     The Board's decision to deny the Plaintiffs' appeals for lack of jurisdiction is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise not in accordance with law.

60.     The Board improperly concluded that "the Part C policy issued in the June 2023 Retroactive Part C Days Final Rule that the Providers appealed for the fiscal years at issue is not

an appealable 'final determination' within the context of 42 U.S.C. § 1395oo(a)(1)(A)(ii) and 42 C.F.R. § 405.1835(a)." **Exhibit 2**.

61.    The Secretary's June 2023 Retroactive Part C Days Final Rule constitutes an appealable "final determination." The Medicare Statute at 42 U.S.C. § 1395oo(a)(1)(A)(ii) authorizes Board appeals when a provider is "is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection ... (d) of section 1395ww of this title." This includes the calculation of a hospital's DSH patient percentage, which is the sum of two percentages, the hospital's Medicare/SSI percentage and its Medicaid percentage. 42 U.S.C. § 1395ww(d)(5)(F)(vi). The Secretary's June 2023 Retroactive Part C Days Final Rule addresses the treatment of inpatient days attributable to patients enrolled in Medicare Part C plans for purposes of calculating hospitals' DSH payment adjustments for discharges occurring before October 1, 2013. Specifically, the June 2023 Retroactive Part C Days Final Rule includes inpatient days attributable to patients enrolled in Medicare Part C plans in the numerator and denominator used to calculate the Medicare/SSI ratio and excludes such days attributable to Medicaid-eligible patients from the numerator of the Medicaid percentage for all cost reporting periods before October 1, 2013.

62.    In fact, the Secretary characterized the June 2023 Retroactive Part C Days Final Rule as a "final action creat[ing] a policy governing the treatment of days associated with beneficiaries enrolled in Medicare Part C for discharges occurring prior to October 1, 2013, for the purpose of determining the additional Medicare payments to subsection (d) hospitals under section 1886(d)(5)(F) of the Social Security Act (the Act)." June 2023 Final Rule, 88 Fed. Reg. at 37772 (emphasis added).

63.    The Secretary's publication of Medicare/SSI fractions applying the June 2023 Retroactive Part C Days Final Rule is also a "final determination" that is appealable to the Board under 42 U.S.C. § 1395oo(a)(1)(A)(ii). *Battle Creek Health Sys. v. Becerra*, No. CV 17-0545 (CKK), 2023 WL 7156125, at *5-*6 (D.D.C. Oct. 31, 2023).   There are NO other variables in calculating the DSH payment missing from the Retroactive Part C Days Final Rule. Especially because the Retroactive Part C Days Final Rule expressly states that the Part C Days have been correctly shown in the Medicare Fraction Denominator for the determination of DSH payments to the providers for fiscal years 2005-2013, there are no other determinations or variables on which the Provider's ultimate DSH payment depends if the Retroactive Part C Days Final Rule is implemented. The Retroactive Part C Days Final Rule IS an appealable final determination "as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title" (as set forth in 42 U.S.C. § 1395oo(a)(1)(A)(ii)) or as to "the total amount of reimbursement due the provider" (as set forth in 42 C.F.R. § 405.1835(a)). "The D.C. Circuit has held that any administrative action that provides a "hospital] [with] advance knowledge of the amount of payment it will receive" is a "final determination." *See Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 141 (D.C. Cir. 1986); *Cape Cod Hospital v. Sebelius*, 630 F.3d 203 (2011) (holding that an agency may appeal to the PRRB from issuance of the Final Inpatient Prospective Payment System Rule). In other words, section 1395oo permits providers to prospectively appeal what they will, in the future, receive as a result of services provided to eligible patients. *Bowen*, 795 F.2d at cost report prior to appeal." *Id.* [Cited in *Battle Creek Health System v Becerra*, U.S.D.C. District of Columbia, Civil Action No. 17-0545 (CKK) Memorandum Opinion dated October 31, 2023.]

64.    For each specific matter and question included in the request, the Board has jurisdiction under 42 CFR §405.1840 over each matter at issue, all as stated in the Providers'

appeal.   The Retroactive Rule is an appealable final determination under 42 USC Section 1395oo(a)(1)(A)(ii), because there are NO other variables in calculating the DSH payment missing from the Retroactive Part C Days Final Rule. Especially because the Retroactive Part C Days Final Rule expressly states that the Part C Days have been correctly shown in the Medicare Fraction Denominator for the determination of DSH payments to the providers, there are no other determinations or variables on which the Provider's ultimate DSH payment depends if the Retroactive Part C Days Final Rule is implemented. The Final Rule IS an appealable final determination "as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title" (as set forth in 42 U.S.C. § 1395oo(a)(1)(A)(ii)) or as to "the total amount of reimbursement due the provider" (as set forth in 42 C.F.R. § 405.1835(a)).

65.     In addition, the Board's jurisdictional decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise not in accordance with law because the Board improperly concluded that "the Providers' appeal request failed to meet the content requirements under 42 C.F.R. § 405.1837(c)." Specifically, the Board found that "Providers' appeal request failed to meet the content requirements under 42 C.F.R. § 405.1837(c) based on its failure to demonstrate that the June 2023 Retroactive Part C Days Final Rule was, in fact, a payment determination retroactively applicable to them for the fiscal years at issue consistent with the terms of that Retroactive Part C Days Final Rule." **Exhibit 2**.

66.     The Plaintiffs' appeal requests identified the cost reporting periods under appeal, which were all cost reporting periods prior to October 1, 2013, and, therefore, were clearly subject to the June 2023 Retroactive Part C Days Final Rule. The Plaintiffs also included in their appeal requests the date of the final determination, the pages and citation of the applicable Federal Register notice, a financial impact statement, an issue statement, a statement regarding audit

adjustments and protest amounts, and a provider representation letter. Therefore, the Board decision dismissing the appeal is invalid.

67.     Furthermore, the Board's finding that it lacked jurisdiction over a Federal Register appeal because the Providers failed to provide documentation establishing the procedural history of their prior NPR-based appeals for all cost reporting periods to which CMS is applying the Retroactive Part C Days Final Rule, is arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, and unsupported by substantial evidence.

68.     The Board's finding that the Providers included no information about their prior NPR-based appeals is contradicted by the record and moreover not required by law. The Providers appealed from a final determination of the Secretary, and nowhere in the statutes, regulations, or Board Rules is there a requirement that hospitals appealing from a final determination of the Secretary also provide documentation of a final determination of a MAC. The requirement that Providers include "any other documentary evidence the provider considers necessary to satisfy the hearing request requirements of paragraphs (b)(1) and (b)(2) of this section [jurisdictional requirements]" is not a requirement that the Providers include copies of all information the Board could possibly wish to review. *See* 42 C.F.R. § 405.1835(b)(3) The Providers' hearing requests identified the prior Board cases and claims to which the Retroactive Part C Days Final Rule would apply. The Board has access to the records of those appeals and has the authority to request that the Providers document the procedural history of the prior appeals if the Board believes it is necessary to resolve jurisdiction in these cases. The Board's decision to dismiss the appeals because it found that the Providers' documentation insufficiently established the unprecedented and convoluted, decades- long procedural history of these claims, without first requesting such information from the Providers, was furthermore an abuse of discretion.

**Count II:**
**Judicial Review under the Medicare Act and the APA**
**(Retroactive Part C Days Final Rule)**

69.    Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as though set forth in full herein.

70.    Retroactive rulemaking is disfavored in the law, and unless provided for expressly, statutes granting administrative agencies the authority to engage in rulemaking should be construed as extending that authority prospectively only. See *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 245 (1994); *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004) ("The aim of the [anti-retroactivity] presumption is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct."). Notably, Justice Scalia opined that permitting such "curative" rulemaking "would 'make a mockery . . . of the APA,' since 'agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to "reissue" that rule on a retroactive basis.' " *Bowen, supra*. (alteration in original) (citation omitted).

71.    The Retroactive Final Part C Days Rule violates established legal case precedents; the Secretary is acting as though such case precedents did not happen and do not exist. The Retroactive Rule also violates and contradicts the Secretary's commitment given in order to obtain Voluntary Remand of Allina III[6] and the Allina II Type Cases[7], that the Secretary would be handing the providers the "victory" they were seeking with regard to the inclusion of Part C Days in the numerator of the Medicaid Fraction. CMS should be estopped from doing anything other than including Part C Days in the numerator of the Medicaid Fraction. CMS has indicated in several rulings and to at least three Federal Courts that DSH reimbursement was going to be made

---

[6] *Allina Health Sys. v. Burwell*, No. 1:16-cv-150 (D.D.C. Jan. 29, 2016)
[7] *In re Allina II-Type DSH Adjustment Cases*, No. 1:19-mc-190 (D.D.C. Nov. 15, 2019)

in accordance with *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011); CMS is estopped to change course now and deny such payments.

72.    The 2023 rule applying the same 2004 change should be rejected because it disregards *Allina I*, *Northeast Hospital*, and *Allina II*, is otherwise contrary to law, exceeds the agency's retroactive rulemaking authority under the Medicare statute, and is arbitrary and capricious for failing any test of reasoned decision-making. Among other infirmities, this final action misconstrues the legal effect of the vacatur of the 2004 rule in *Allina I*, 746 F.3d at 1105, which restored the pre-2004 DSH Part C standard. By excluding Part C days from the numerator of the Medicaid fraction for any patients discharged prior to October 1, 2004, and by disclaiming any pre-2004 policy or practice treating Part C days as not Part-A-entitled days, the agency also again disregards *Northeast Hospital*. 657 F.3d at 16–17.

73.    In addition, the rule violates 42 U.S.C. § 1395hh(e) because neither of the narrow exceptions for retroactive rulemaking applies here given that (1) the ambiguous DSH statute does not require any specific treatment of Part C days in the DSH calculation, *see Allina I*, 746 F.3d at 1106; *Northeast Hosp.*, 657 F.3d at 13, and the DSH statute does not require a retroactive rule for the agency to comply with its obligation to make payments; and (2) the 2023 rule cannot be said to be in the public interest, given that it offends fundamental notions of justice, disregards the significant public interest in *advance* notice-and-comment rulemaking, and results in thousands of safety-net hospitals losing billions of dollars in funding that has been illegally withheld for years.

74.    Nor can the agency retroactively "establish," rather than "change," the Part C DSH standard under the plain language of the Medicare statute. *See* 42 U.S.C. § 1395hh(e)(1)(A). And even if there were any ambiguity as to whether the agency had the authority to engage in this retroactive rulemaking under section 1395hh(e) (and the agency clearly lacks that authority), any

24

such ambiguity would need to be read against retroactivity, given the well-established presumption in law against retroactivity. The rule conflicts with other provisions of the Medicare statute prohibiting action against providers with respect to noncompliance with its substantive change and precluding untimely reopening and revisions of claims payment determinations. *See* 42 U.S.C. §§ 1395hh(e)(1)(C), 1395gg(c).

75.     In addition, the final action violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(4), which bars the agency from effectuating or applying the same policy change from the rule vacated in *Allina I* as a logical outgrowth failure, 746 F.3d at 1105, at least until *after* the effective date of a legally sound notice-and-comment process adopting the rule prospectively only, *see Allina II*, 863 F.3d at 945; *Allina II*, 587 U.S. at 581–84. The rule further violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(2) because the agency again seeks to make the change "take effect" *before* affording impacted providers the requisite notice and comment. *See* 42 U.S.C. § 1395hh(a)(2); *Allina II*, 587 U.S. at 571–80.

76.     The final rule is also arbitrary and capricious for many reasons, including that the agency failed (1) to acknowledge, let alone explain, that the policy readopted retroactively in the rule departed from the pre-2004 rule and practice previously readopted prospectively in 2013; (2) to consider properly the hospitals' reliance interests in changing its pre-2004 position; and (3) to recognize the enormous adverse financial impact on hospitals of its policy change, despite asserting that it had already made hospitals' DSH payments based on the change and having represented to the Supreme Court in seeking certiorari that the impact with respect to only one of the DSH fractions was "between $3 and $4 billion for federal fiscal years ("FFY") 2005 through 2013." Once again, through the 2023 rule, the agency continues to deny a 2004 change in policy and practice and made one last-ditch effort to accomplish the same change in yet another

substantively and procedurally improper fashion. It must be set aside to stop the agency's repeated circumvention of the law.

77.     Retroactivity of the Retroactive Rule is improper under the law, in that it is not "necessary to comply" with any statute and its lack of retroactivity would "not be contrary to the public interest." 42 U.S.C. § 1395hh(e)(1)(A).  Indeed, the Retroactive Rule deprives hospitals who serve low-income patients of much needed reimbursement and has resulted in deep cuts and closures of many hospitals around the country.  The Administrative Procedures Act generally prohibits retroactive application of new rules on past actions; retroactivity alters the consequences to providers after the fact.

78.     Retroactivity of the new rule exceeds the agency's rulemaking authority under the Medicare statute. The span of many years of retroactivity encompassed in the Retroactive Rule is per se unreasonable, arbitrary, capricious, and contrary to the spirit and policy of the rulemaking authority under the Administrative Procedures Act which governs Medicare.

79.     The new Retroactive Rule is arbitrary and capricious, and fails any test of reasoned decision-making, especially because so much time has passed and because other hospitals' claims have been paid on the basis of Part C Days being calculated in the numerator of the Medicaid Fraction instead of the denominator of the Medicare/SSI Fraction.

80.     It is a fallacy that Rule 1739-F would have to be retroactive in order to comport with the language of the statute as interpreted in *Becerra v. Empire Health Foundation, For Valley Hospital Medical Center*, 597 U. S. 424 (2022) ("*Empire Health*").  *Empire Health* is distinguishable, wrongly decided and should not pertain to this issue.  Although the Supreme Court in Empire Health did not say that the Medicare statute compelled this outcome, CMS is interpreting Empire Health as though it did so state. Plaintiffs maintain this conclusion is incorrect and

improper.  As Justice Kavanaugh correctly wrote in his *Empire Health* dissent, "this case is resolved by the most fundamental principle of statutory interpretation:  Read the statute." (emphasis added.) His analysis continues that the statute makes clear that the reimbursement rate is determined by the number of covered days, not total days. "Zero in on the phrases "entitlement to have payment made" and "for such days,"  *Empire Health, Id.,* Kavanaugh, J., dissenting.[8]

81.    Rule 1739-F is not in accordance with the statutory language shown in Section 1886(d)(5)(F) of the Social Security Act ("the Act") (42 U.S.C. 1395ww(d)(5)(F)).  Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024), Courts assess de novo whether an agency's rule is consistent with the underlying statute. The Providers challenge the requirement of including M+A, HMO or Part C Days in the Medicare/SSI fraction, asserting that it deviates from the statutory meaning, purpose and intent.

82.    Although CMS has argued that such rulings are "merely interpretive," even if published on the Federal Register, CMS has been told more than once by courts that it could not change positions like this from a former policy to something new, without formal notice-and-comment rulemaking.  See, e.g., *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) (The *Northeast* decision invalidated a purported "rule" stated in 2004 by Defendant, without notice-and-comment rulemaking, that changed previous course and included Medicare Part C

---

[8] Justice Kavanaugh also wrote, years earlier in a concurring opinion in *Northeast,* that the plain language of the statute unambiguously foreclosed the agency's interpretation because it "is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day." *Id.* at 24 (Kavanaugh, J., concurring). This is because, he explained, "entitlement" means "*to have payment made*," and "a Medicare patient enrolled in a Part C plan does not have the right 'to have payment made under, and subject to the limitations in, [Medicare] part A.'" *Northeast, supra.* at 20. He noted that "[t]he only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible." *Id.* at 20 n.1. Like the majority, he similarly found that the agency "interpreted the statute as the Hospitaldoes here" until 2004, when it "abruptly changed course, apparently because of an overriding desire to squeeze the amount of money paid to Medicare providers (and beneficiaries).... this statute does not permit HHS to pursue fiscal balance on the backs of Medicare providers and beneficiaries in this way." *Id.*

Days in the Medicare Fraction denominator.  The *Northeast* case held that such calculation cannot be used for 2004 and prior—which the government has ignored for all these years).

83.    The Retroactive Part C Days Final Rule is also arbitrary and capricious because the agency changed its pre-2004 position without properly considering reliance interests. When an agency is "'not writing on a blank slate,'" rational decision-making requires an agency "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020) (citations omitted); Mirror Lake Vill., LLC v. Wolf, 971 F.3d 373, 376 (D.C. Cir. 2020) (explaining that agency action is arbitrary and capricious if it is "not 'reasonably explained'" (citation omitted)). CMS violated this legal duty. It failed adequately to consider and to weigh financial reliance interests against the considerations that animated its policy. It dedicated a mere three sentences of its 2023 rule to financial reliance interests—one stating that no hospitals commented that they made financial decisions in reliance on the prior policy, another saying that reliance would be unreasonable, and a final one repeating the fiction that the rule does not reflect a change in agency policy. 88 Fed. Reg. at 37,785–88. But there were, in fact, numerous comments, including from Montefiore, stating that "DSH hospitals across the country relied on the agency making DSH payments in accordance with [prior policy]." Christopher Panczner, System Senior Vice President & Chief Legal Officer at Montefiore Medical Center, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 2, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0050; Michael Breslin, Group Senior Vice President & Chief Financial Officer & Treasurer, NewYork-Presbyterian, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a

Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 2, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0058 ("The proposed rule ignores that DSH hospitals relied on the agency making DSH payments in accordance with the Court of Appeals' and Supreme Courts' decisions."); see also Brian Vamstad, Manager of Regulatory Affairs and Payment Policy at Allina Health, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 5, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0053; John Mallia, Executive Vice President and Finance/CFO of Maimonides Medical Center, Comments on Proposed Rule Case "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 5, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0091 (same); Robert Nesselbush, EVP and Chief Financial Officer of Kaleida Health, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Sept. 29, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0013 (same); Karen Kim, Vice President – Appeal Services of Toyon Associates, Inc., Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate atient Percentage" (CMS-1739-P) at 4 (Oct. 2, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0040 (same); Michael Newell, President of Southwest Consulting Associates, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 7 (Oct. 1, 2020), https://www.regulations.gov/comment/CMS-

2020-0089-0025 (similar); Stephanie Webster, Partner at Ropes & Gray LLP, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 14 (Oct. 5, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0092 (similar).

84.     Many hospitals including the hospitals in the *Allina* litigation, raised similar arguments in their January 2015 comments in response to the Administrator's notification of review on remand, asserting that they relied on the unamended pre-2004 regulation and continuation of the agency's pre-existing policy. See Providers' Comments to CMS Adm'r on Remand, Allina Health Servs. v. Blue Cross Blue Shield Ass'n, PRRB Case Nos. 10-0165G et al. at 39 (Jan. 23, 2015). More specifically, those comments explained that they reasonably forecasted their DSH funding based on the continuation of the pre-2004 standard and had no reason to project a reduction in such funding because CMS did not (1) actually adopt its change to the regulation in 2004 despite announcing its intent to adopt an abrupt policy reversal on Part C days; (2) issue SSI fractions treating Part C days as Part A days for FFYs 2005 and 2006; and (3) provide hospitals with accurate information concerning how that policy change would affect DSH payments once implemented. See id. at 37–43.

85.     In any event, even if there were no such comments, CMS would still need to consider these financial reliance interests. See *Regents of the Univ. of Cal.*, 591 U.S. at 8 (striking down rescission of government program for failure to consider reliance interests, even where the rescission process did not involve an opportunity for notice and comment). CMS also entirely failed to mention non-financial reliance interests in its 2023 rule. Because reliance interests in the pre-2004 policy are "legally cognizable," the agency had a duty to consider these reliance interests even if, in the agency's view, its prior pre-2004 policy did not reflect the best reading of the statute.

See id. at 1913–14 (holding that DHS needed to consider reliance interests even in a program it was rescinding because, in DHS's view, it lacked a legal basis). "[W]here the agency has failed to provide even [a] minimal level of analysis [regarding reliance interests], its action is arbitrary and capricious and . . . cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217 (2016). Instead, an agency must provide a "reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position." Id. at 224. The agency's failure to respond adequately to such comments raising reliance interests, among other issues, is also arbitrary and capricious. See *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211–12 (D.C. Cir. 2011) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to relevant and significant comments." (internal quotation marks omitted)); Reytblatt v. U.S. Nuclear Regul. Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997) (explaining that agencies "must respond in a reasoned manner to [comments] that raise significant problems"); Gresham v. Azar, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decision making."), vacated and remanded on other grounds sub nom. Becerra v. Gresham, 142 S. Ct. 1665 (2022).

86.    The agency has still failed to acknowledge and justify the enormous adverse financial impact on hospitals of the Part C days policy in the final action. CMS does not, and cannot, reconcile its assessment of the financial impact here as between "$0" and "$0.6 billion," 88 Fed. Reg. at 37,793, when it previously represented to the Supreme Court in seeking certiorari in Allina II that the impact with respect to the SSI fraction "alone implicates between $3 and $4 billion in reimbursement for FY2005 through FY2013," Pet. for Writ of Cert. at 14, *Allina II*, 587 U.S. 566 (2019) (No. 17-1484); see *Allina II*, 587 U.S. at 571 (observing that the inclusion of Part C days in the Medicare fraction "makes the fraction smaller and reduces hospitals' payments

considerably—by between $3 and $4 billion over a 9-year period, according to the government"). Nor has the agency adequately explained why the policy change is appropriate despite the adverse impact on the nation's safety-net hospitals, like the plaintiff hospitals, that shoulder the financial burden of treating a disproportionate share of low-income patients. The agency also asserts that "[i]t is not clear what to compare an estimate of DSH payments under [the] final policy." 88 Fed. Reg. at 37,793. But by now, nearly 20 years after the agency first adopted the vacated policy that it seeks to readopt retroactively in this 2023 rule and over ten years after that policy was first vacated in *Allina I* and then readopted prospectively in 2013 during that litigation, CMS has had more than enough time to do what is necessary with data at its disposal to calculate the effect of the Part C days issue accurately, particularly since the agency has been on notice since the 2012 district court decision in *Allina I* that its policy was invalid and the pre-2004 policy reinstated. If DSH payments made under the proposed rule would not differ from historical DSH payments, that is purely because CMS has erroneously continued to make payments to hospitals under its unlawful policy even after that policy was vacated twice. And given that "Medicare DSH payments have already been made under the policy reflected in the proposal," id. at 37,790, the agency should have been able to determine accurately the financial impact of the 2023 rule on hospitals. The rule is, therefore, arbitrary and capricious. See *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious where agency has "entirely failed to consider an important aspect of the problem"); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011) (vacating a Securities and Exchange Commission rule as arbitrary and capricious because the agency had failed "adequately to assess the economic effects of a new rule" by, among other things, "inconsistently and opportunistically fram[ing] the costs

and benefits of the rule" and "fail[ing] adequately to quantify the certain costs or to explain why those costs could not be quantified").

87.     In addition, the Retroactive Part C Days Final Rule also violates the requirements of the Regulatory Flexibility Act ("RFA"), which requires agencies to assess the negative impact of their rules on small businesses, including hospitals, see 5 U.S.C. §§ 604, 605(a)-(b). The agency claims in the rule that "the DSH payments . . . will not differ from historical payments for years after [F]FY 2005 for most hospitals," 88 Fed. Reg. at 37,790–92, and fails to conduct adequately a regulatory flexibility analysis, see U.*S. Telecom Ass'n v. FCC*, 400 F.3d 29 (D.C. Cir. 2005) (holding that the FCC violated the RFA by issuing a rule without a regulatory flexibility analysis and staying enforcement of the rule against small entities pending further regulatory analysis on remand).

88.     The Retroactive Part C Days Final Rule is also arbitrary and capricious for failing to consider and address *Empire Health* in the proposed rule while relying on it heavily in the final rule. The agency did not even mention *Empire Health* in its proposed rule, see 85 Fed. Reg. 47,723, despite the Ninth Circuit having ruled against the agency in May 2020, see *Empire Health*, 958 F.3d at 878. The agency's pattern is clear: it omitted *Empire Health* from the proposed rule when it was losing that case, and then introduced the case as a central rationale for its 2023 rule once it won the case. By ignoring this purportedly crucial case in its proposed rule, CMS engaged in arbitrary and capricious agency action. See *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018) ("An agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning.").

89.     The agency's continued application of the 2004 policy is also arbitrary and capricious because the agency has failed to provide a rational explanation for its inconsistent

interpretation of the same phrase "entitled to benefits" within a single sentence of the DSH statute. See T*ransactive Corp.*, 91 F.3d at 237 ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."). With respect to the Part C days at issue here, the agency interprets "entitled to benefits" under Part A of Medicare to include all Medicare beneficiaries who have ever once met Medicare Part A eligibility requirements, regardless of whether they are entitled to payment of Part A benefits, while at the same time the agency construes that same phrase concerning SSI benefits to include only those days for patients who were entitled to have SSI benefits paid to them on those days. See 78 Fed. Reg. at 50,617; see also *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 26 n.12, 42 (D.D.C. 2008).

90.    Finally, the Retroactive Part C Days Final Rule is arbitrary and capricious because it is downright irrational and internally inconsistent. For example, on one hand, the agency claims that "if there is a gap in the statute to fill, the Secretary would be unable to calculate and confirm proper DSH payments for time periods before [F]FY 2014, which would be contrary to the public interest of providing additional payments to hospitals that serve a significantly disproportionate number of low-income patients, as expressed in the DSH provisions of the Medicare statute." 88 Fed. Reg. at 37,775.  But on the other hand, the agency states (incorrectly) that "Medicare DSH payments have already been made under the policy reflected in the proposal." Id. at 37,790. The rule cannot be required to fill a statutory gap "to avoid the consequences of legal ambiguity," *id.,* regarding payments if the agency has, in fact, already made those payments.

91.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. §706(2)(A), or that is "unsupported by substantial evidence," id. §706(2)(E).

92.     The Retroactive Part C Days Final Rule is arbitrary and capricious, an abuse of discretion, and otherwise contrary to the Medicare Act and Supreme Court law.

### Count III:
### Judicial Review under the Medicare Act and the APA
### (Unreasonable Delay of Administration of Claims)

93.     CMS' payment of DSH reimbursement has been unreasonably delayed and should have been made long ago.   DSH reimbursement for Providers' year in this appeal should be made in accordance with policies existing prior to 2014 and including payment of attorney fees and interest for all the years of delay, as provided in 42 U.S.C. § 1395oo(f)(2).

94.     Previously, Providers have been paid DSH without M+A, HMO or Part C Days in the Medicare fraction and there is no reason for different treatment.   If and to the extent now implemented, CMS Rule 1739-F will create a situation where similarly- situated parties are treated dissimilarly, which is an arbitrary and capricious agency action.

95.     Administration of these claims, as required by *Allina I, Northeast Hospital, and Allina II*, has been long and unreasonably delayed since 2011. The conduct of the Medicare agency has been entirely disingenuous, including violating or ignoring altogether valid legal authority and precedent, committing to courts to re-calculate in the proper way and then failing and refusing to do so, and issuing both tacit and express "holds" of Medicare payments pending formal rulemaking with the illicit purpose of asserting thirty years of retroactivity in contravention of all the law that already had denied retroactivity during that time period.   This is a continuation of Defendant's decades-long effort to squelch the DSH program. One can "appreciate the desire for frugality, but not in derogation of law." *Northeast Hosp. Corp.*, 657 F.3d at 20 n.1 (Kavanaugh, J., concurring in the judgment).

96.     In and before April 2020, CMS imparted a "Hold" on all DSH claims, taking the position that, unless and until CMS issued new or revised Notice of Program Reimbursement ("RNPR's") for all the claims that had been previously remanded to await this new rule, appellants had no right to object or seek remedy from the courts.  Under this argument, the Secretary controlled when or even if these particular claimants can pursue administrative remedies.  This is and was violative of the APA, and sound legal principles including due process rights.

97.     Also, the RNPRs were unreasonably delayed and should have been issued years earlier.  The so-called "Hold" and the delay in administration was years in the making.  Moreover, while the Retroactive Rule indicated that instructions would be provided to the Medicare Administrative Contractors ("MAC") for publishing such RNPRs, none were forthcoming for more than a year even though the Retroactive Rule was published June 9, 2023.  CMS has given no explanation for the delay in publishing the instructions to the MAC for publishing of such RNPRs.

98.     The SSI ratio calculated by CMS and used in the Medicare fraction is and remains incorrect. Without limiting the foregoing, the SSI ratio used in the Medicare fraction is and remains incorrect if the reasons asserted by the hospitals in *Advocate Christ Medical V. Becerra* 80 F.4th 346 *Cert. granted* 6/10/2024 ("*Advocate Christ*") are accepted by the Supreme Court of the United States.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request relief and an Order from this Court:

1.      declaring that Plaintiff's Appeals from the Secretary's final determination in the Retroactive Part C Days Final Rule were improperly dismissed by the Board;

2.      declaring that exhaustion of administrative remedies is excused because remand of Plaintiffs' appeals back to the Board for adjudication would be futile in that the Board lacks the authority to determine the ultimate question of whether the Retroactive Part C Days Final Rule is invalid;

3.      declaring unlawful, setting aside and vacating the Retroactive Part C Days Final Rule and the SSI Ratio published under the terms of the Retroactive Part C Days Final Rule;

4.      declaring invalid and setting aside the final payment determination reflecting the policy of including Part C days in the Medicare Part A/SSI fraction and excluding Medicaid-eligible Part C patient days from the numerator of the Medicaid fraction used to calculate the plaintiff hospital's Medicare DSH calculation for the cost reporting period at issue;

5.      directing and requiring the agency to promptly and without further delay re-calculate Providers' DSH benefits for fiscal years 2004-2013 with Part C, Medicare HMO and Medicare Advantage Days omitted from the Medicare Fraction of the DSH Calculation, and with those Part C, Medicare HMO and Medicare Advantage Days for which patients were Medicaid-eligible included in the Medicaid Fraction of the DSH Calculation;

6.      declaring the administration of Plaintiff's claims to be long and unreasonably delayed since 2011;

7.      awarding Plaintiffs interest on their reimbursements as provided under 42 U.S.C. § 1395oo(f)(2);

8.      awarding Plaintiffs the legal costs and fees incurred by the Plaintiffs; and

9.      providing such relief in law and/or equity as this Court may deem just and proper.

Dated: October 25, 2024

By: _____/s/ Ellen K. Wolf_____
    Ellen K. Wolf (CA Bar No. 110686)
    ewolf@wolfwallenstein.com
    Christopher J. Cummiskey (SBN 244249)
    ccummiskey@wolfwallenstein.com
    **WOLF WALLENSTEIN, PC**
    11400 West Olympic Boulevard, Suite 700
    Los Angeles, California 90064
    Telephone: (310) 622-1000
    Facsimile: (310) 457-9087

    *Pro Hac Vice Admission Pending*

    Roya Vasseghi (DC Bar No. 1014058)
    roya@vasseghibuddlaw.com
    VASSEGHI LAW GROUP
    9663-D Main Street
    Fairfax, Virginia 22031
    (703) 215-9358 Tel.
    (703) 563-7401 Fax

    *Attorneys for Plaintiffs*